Good morning. Before we begin, on behalf of my colleague, Judge Sirica, I just want to welcome our colleague sitting with us by designation from the Southern District of Texas, Judge Lee Rosenthal. Thank you for being here, Judge Rosenthal. Thank you, it's a pleasure. The first case this morning is United States v. America v. Joseph Ferriero. Mr. Goldberger. Good morning. Good morning, Judge Rosenthal. Good morning. May it please the court, my name is Peter Goldberger and it's my privilege this morning to represent Joseph Ferriero, the palantir, of course, and the defendant below. You're asked to reserve three minutes for rebuttal. Yes. So Mr. Ferriero, as I'm sure you remember, was convicted on three of five counts, all relating to just one of three schemes that were charged in the indictment, statutory basis for conviction, RICO, Travel Act, and wire fraud. There are significant flaws in every count of conviction. The need for reversal is made particularly apparent by the approach to statutory construction illuminated by the Supreme Court in the recent McDonnell case. Because when the federal government, as here, goes after local political activity, and here even at a lower level than in McDonnell, with a novel and extravagant application of federal statutes, the courts have the responsibility to rein them in. Even where the state law applies to non-public officials? Yes, yes, the Supreme Court applies the same federalism concerns in the Ruiz case in the 70s, and it's not limited to cases where there's no federal, where no state statute incorporated. In fact, in some ways, the concerns are at least as much. And this court said the same in Dansker, which was based on state law bribery cases and trades again after Dansker. But McDonnell was a federal statutory construction case, isn't it fair to say that? Yes. What's a little odd, at first blush, is the conduct of McDonnell was much more severe than the conduct alleged against your client here. So he's got that going for him, I guess. But the statutory mismatch seems to go in the other direction, does it not? Well, I wouldn't say that. And I also think that it's important to remember the aspect of McDonnell that your Honor just brought up, that is that we don't judge whether people ought to be found guilty or whether their convictions should be affirmed based on how we feel morally about the conduct. Is there a mismatch between the conduct and the statute narrowly construed with those constitutional concerns in mind? So let me use Counts 1 and 3, the Reco and Travel Act cases, based on the state bribery statute, as your Honor suggested, as the first example of that. So the state law, as construed by this court in those two opinions I already mentioned, both by Chief Judge Seitz, in the 70s and 80s, Dansker and trades, the court was already focused on the same concerns, this court was focused long before McDonnell, on the same concerns that we highlighted. The statute prohibits payment for the apparent ability to exercise influence through articulating opinions and recommendations. No requirement of official act, no requirement of quid pro quo in the New Jersey statutory bribery provision. So instead the recommendation has to be that in relation to, actually not in relation to, but on a public issue. This court in the 70s and 80s interpolated a requirement of proof of an intent to corrupt the process, not in the statutory language, similar to what the Supreme Court did in McDonnell, introducing a requirement to narrow and focus the statute to avoid constitutional problems into the enforcement, at least in federal court, of the New Jersey statute. To avoid what they called a First Amendment, what this court called a First Amendment problem. The government ridicules the idea that there could be a First Amendment problem in a bribery case. Several places in the brief they treat it as a facetious argument. It was the basis of this court's decision in Dansker as reaffirmed in trades. And carried forward in a whole series of opinions all the way to Ben Savango, the latest in that line. The evidence in this case is insufficient to show that intent to corrupt the official process on a public issue. Do you agree that the evidence suffice to show the appearance of corruption, the appearance of influence? I, you know, yes. Appearance of quid pro quo? Well, a quid pro quo, the government emphasizes quid pro quo, although ironically that's not an element of this kind of bribery. Well, let's go back to the first question I asked. I apologize for tripping up myself, but put aside the quid pro quo vocabulary, although we might come back to that, was there at least an appearance of corruption? Well, you could say, to be fair, you could say that there was because of the multiple hats that the defendant wore. And is there substantial evidence to show that he was acting wearing his chairmanship hat? No. No, there is not. What's missing? Well, I suggested a number of factors that might have been there that could have suggested it. The recommendations could have been made or forwarded at a party event, perhaps. It expressed invocation of it. But only, I think, one way. There was an event at a conversation at the BCDO-sponsored golf event. There were other occurrences that took place that seemed pretty clearly linked to, I'm here as chair. Well, actually, we get into a very detailed dispute with the government about whether that event was BCDO-sponsored. And it's kind of a battle of the footnotes over that. I asked about substantial evidence, not whether it was compelling or whether there was only one conclusion to be drawn. No, that's not what it is. It's whether their claim that this was a BCDO event is, in fact, accurately based on any evidence that was presented to the jury. None of our disputes are about matters that were for the jury to decide. We're very scrupulous about that in the argument. And I think, is it one of five or two, maybe two of five, even said that they had the impression that the defendant was acting in his capacity and none could point to a specific concrete proof of it or a basis for having that impression. Of course, in Dansker, they lacked even that awareness. The targets of the alleged influence weren't even aware of the fact that he was a public official, that the defendant was a public official. That's very different from what we have here. Right. Dansker was under a different set of circumstances. He happened to be a public official and also was a neighbor of the project that was being built. How does the failure to disclose the interest factor into this? Well, we could turn to Count 5, which that's the fatal flaw in Count 5. And again, we have the government fighting against this court's precedent. Kerr packaging, packages, sorry, the 1991 opinion Your Honor wrote, I don't even remember it from 25 years ago, but is the most clear articulation, but it's not an outlier. I've recited many cases that stand for the same proposition, that in the law of fraud, there is this line that's drawn between failure to disclose and misrepresentations that are based on half-truths or active concealment. The government's theory for Count 5 depends upon obliterating that line. There is a non-disclosure here. Well, you cite Chiarella, but that's not really a half-truth case. That's an all-or-nothing case, right? And isn't this case a half-truth case? We cite Chiarella, well, let me take both parts of that. We cite Chiarella, if I remember, as a securities fraud case. It's not a mail fraud case. And so we cite it really just for the proposition that this is a typical and standard categorical line that's drawn in the law of fraud. It exists in securities fraud, it exists in Chiarella, it exists in mail fraud as incorporated into RICO, which is in Kerr packages. The Supreme Court articulated the same line again in Escobar, the case just at the end of last term, which was a false claim to that case. This is not unusual in the law of fraud. So if the government had a claim here at all, it would be a half-truth claim. If you agree it's a half-truth case? That would be their argument. So what makes a statement a half-truth? So you don't need a fiduciary duty to half-truth? That's right. And I've never said that you need a fiduciary duty. This is another So then we get into, is this something, would his silent partner interests have been something that the municipal officials wanted to know when they were deciding whether to hire him? They specifically said they would want to know it, but that's not a determinative factor at all. I mean, that's exactly what's wrong with the construct that the government implies but never defends. But why? Because if they're responding with a half-truth to a clear desire to know the full information, then how would that be? Yes. If that were the case, then you would have sufficient evidence. But it's not the case. What you have is a specific question being asked, which is not what the mayor told his lawyer he wanted to know. The mayor said, I want to know who's involved in this project. But to the lawyer, not to the defendants. So you take that to mean, well, they should have asked a better question. Yes. I mean, just because they might have asked a more explicit question, it does not necessarily follow, does it, that the question asked is ipso facto inadequate? Where the question is specific and the context makes it reasonable to understand in the dynamics between the parties that the specific question is the question they ask and are intending to ask. So a lawyer asks, or, I'm sorry, a CFO asks a lawyer, who are the owners of this corporation? Which is the question that they asked. And the defendant, the co-defendant, answers that question. Here are the corporate papers that tell you who the owners of the corporation are. And that is an accurate, complete answer to the question, who are the owners of this corporation. That couldn't be deemed a half-truth by a juror? No. To call that a half-truth is to obliterate the line between a nondisclosure and a half-truth. What was the purpose of the question, though? From the questioner's point of view? Yes. What was the questioner really wanting to know in that circumstance? Well, according to their testimony, they testified to the answer to that question. They wanted to know, did Mr. Ferriero have an involvement in this transaction? But they didn't ask that. They asked, who are the owners of the corporation? How is Ferriero or Carino to know that they want, or that they have a duty, a criminally enforceable duty, to answer some other question that isn't being asked? Didn't Carino inquire how he should respond when the question was posed? Isn't that probative? That is not, well, the government, that's an inference the government asks you to draw. But it doesn't, it's not an inference that can, in fact, be drawn from the evidence. Because what the evidence showed, and this we laid out very carefully, again, in our brief, and again in our reply brief, what the evidence shows is that Carino did not know what the question was until after the conversation with Mr. Ferriero. There was a phone message left, just a call me back message on day, call it day one. Then there is the meeting between Carino and Ferriero, the details of which we don't know about, but I'll give the government, we give the government the benefit of the inference on that. Then the next morning, Carino calls Dichter back and asks, which says I'm returning your call, what's up, and then finds out what the question is, and answers it. One more question. Of course. Considering the context in which the question was raised, which is information about prior undisclosed dealings that had been had. I'm sorry, I didn't hear the last few words. Information about prior undisclosed financial interests that Mr. Ferriero had, wasn't it considered it as asking? I don't believe there is anything in the record that says that either Ferriero or Carino was aware of the broader concern. Someone caused the Bergen County official to raise the question in the first place. And was there any evidence that you are taking into account or not as to whether Mr. Ferriero or Mr. Carino was aware that the Cliffside inquiry was in fact targeted towards finding out if Mr. Ferriero had any involvement? I do not recall and I don't believe there was any evidence that Ferriero or Carino, and of course Ferriero is responsible in this context for what Carino may have known, knew that that was the concern behind the question. That was not, that had not been relayed. Go ahead. So I see the red light is on. No, no. Okay. Good. We have a very generous presider here. Not for that. Maybe not as generous as the judge that you once worked for. His spirit rules the red light. On count five on the wire fraud, take me through the chronology of the Berardo Carino. situation. You know, what exactly was known on July 9th? And the fact, it appears that no action was taken. Yes. No official action was taken. And I just, I'm unclear as to the chronology, what was said and what was known at the time. On page 13 of our brief, and particularly footnote 9, we go through page by page, exhibit by exhibit, witness by witness, everything that you can discern from the record about this chronology question. Because we recognize that it was critically important to this issue. And what we have is Berardo calls Carino on the afternoon of July 8th, leaves a message. Ferriero emails Carino that same afternoon. Ferriero emails Carino. Not Carino emails Ferriero. So the message is left with Carino. But the next thing is, is it happens to be an email from Ferriero to Carino saying can you meet at Stoney, referring to a restaurant where they like to meet sometimes. No evidence of any connection between those two presented from any witness or in any document. Carino calls Ferriero back that afternoon. They speak again. I don't know what's said. And Carino, according to the record, does not call Berardo back until 9 o'clock the next morning. Then is when he finds out what the question is that Berardo is relaying from the mayor. Does that? Yes. And that's page by page to the transcript via the appendix in footnote 9 of our brief. And when was the last action with respect to C3? The billing? The billing? The billing and payments? Yeah. Ferriero got paid on a quarterly basis, town by town, for every town that leased the product. I don't know the states, but they're all in the brief. Subsequently, yes. So I could sit down now or I could spend a moment with your indulgence on the nexus issue, Enrico. I think we'll hear you. We'll hear you on the bottle. Thank you, Mr. Goldberger. Mr. Keller? Good morning. I'm Bruce Keller. I represent the United States. And what I'd like to do is start by filling in a couple of holes in the chronology that you just heard because I recognize we have a very different view of the record. Before I fill in those holes, though, I want to emphasize that the law of fraud in this area where there's a half-truth, as we just heard acknowledged, does not turn on the precise question asked at all. Why is that? That's because of the black-letter law that you cannot use the negligence of the victim as an excuse for your crime. And here, I don't even think the testimony is all that clear, and I did not want to leave you with the impression that we concede. The question actually put in those words was, who are the owners? I think it was broader, and there's lots of testimony that suggests it was broader. But let me point out a couple of key facts in the chronology that I think seals the deal. It is clear that in early July of 2008, it was public that Mr. Ferriero was having some legal problems. And those legal problems related to his interest in yet another company that was doing business with municipalities and officials in Burden County, and that was, I believe, the Governmental Grants Consulting Entity. And one place in the record where that's crystal clear is that Mr. Ferriero's lawyer below acknowledged to Judge Salas at page 2675 of our appendix that he had asked repeated questions on cross-examination about the grand jury investigation to Mr. Ferriero that was going on at the time. So the jury knew that in July 2008, something was up. Then, when Mr. Carino was cross-examined, the question was whether or not he knew that Mr. Ferriero was having legal troubles in July of 2008, and that's at page 3633 of our appendix. And then, the jury also heard that Cliffside Park stopped paying for C3 in July when all of this basically became public. Those are key facts, because when you couple those facts with the black-letter law, which, as we have pointed out to the Court, is set forth in the restatement, and endorsed by this Court, and endorsed most recently by the Supreme Court in the universal health case, it is true that there can be some non-disclosures that are not fraud, but there is always a duty to disclose when the defendant has a reason to know that a partial or ambiguous response will be misleading. That's section 551, subsection 2 of the Restatement of Torts. But there's two other sections that also bear on this, and this is why the jury instruction, the model jury instruction, which was the instruction used in this case on fraud, is so important, because the jury heard those facts, and it's also the case that when a response is capable of two interpretations, one of which is false, but the defendant intends the false one, that imposes on the defendant a duty to be truthful and more forthcoming. Why was it false to say that Carino was the owner? Isn't it accurate as a matter of corporate law that Ferriero was not an owner? So it's another proposition of Black, Red, and White in our honor that a literally true answer can nonetheless be misleading. So I understand that, but I thought you just said it was false, and I'm questioning whether it is directly false. I apologize if I misspoke. It was literally true, but it was clearly misleading. All right, then why? It was clearly misleading because the defendant knew what the question really was. And again... And how do we know that? Well, we know it from the sequence that we just went through. We know it from the fact that public available information included that Mr. Ferriero had interest in companies doing business with Bergen County entities and Bergen County public affairs. If it was so well known, why wouldn't the question have been asked, does this guy have any interest in this company? That's why... That seems like a layup, doesn't it? Yes. You're painting a picture that this is just well known in the community, where there's smoke, there's fire, and yet they ask this cryptic question, who are the owners of the company? So that's why I think earlier I said I do not, the government does not concede the question was as narrow as Mr. Berardo said it. I think who owns the company was actually him on the stand testifying in a colloquial manner because we also have Councilwoman Spodo saying they wanted to know who was involved. We know that was the question from the mayor to Mr. Berardo, and we know that the question was, right after he says who owns the company, the question is, well, did you ever ask in a similar situation a similar question, and the question was described as who was involved? And he said no, he didn't quarrel with parsing. But I come back to first principles. We have evidence that Mr. Corino was aware of the legal problems that Ferriero had had and that those were fairly widely known for undisclosed dealings with other Bergen County townships? I think, Your Honor, the page site I gave you earlier, supplemental appendix page 3633, answers that question in the affirmative. He did know. Is that enough to answer Judge Hardiman's question, which is was it clear that this was the intent of the question that was raised even though it was more narrowly framed? I think that is enough, but I also think there's more. I think if you put all of the holes in the record that I just laid out for you and you review the record, you will conclude, as the jury did, that it was reasonable to believe that this was a game. We are going to answer this question very narrowly on the supposition that the actual words used were ownership. And the jury also heard. This is everything. Lots of other evidence in this case suggests that this is not the first time narrow questions were answered very precisely and narrowly to avoid the true issue. The jury also knew that despite his promise, Mr. Ferriero's promise, to Mayor McHale of Dumont, that he would never recommend a vendor in which he had an interest, he did so anyway and concealed the fact from Mayor McHale. The jury also knew that Mr. Ferriero had a history of concealing and denying relationships with companies that he was involved with, and that's at Supplemental Appendix pages 2, 6, 5, 1 to 5, 2. That's more than enough for a reasonable juror to conclude that this was a game of gotcha. And what does Mr. Carino do? He doesn't just send back the corporate ownership documents. He sends it back with the contract as if he's representing, and this comes directly from the Supreme Court's Stewart v. Wyoming case, here you go, these are the owners, sign the contract, there's nothing else to disclose. That is in essence an affirmative representation that everything's fine, sign the contract. But it wasn't fine. And they stopped paying because it wasn't fine. And that's fraud. And the record on this, I think, is crystal clear. The jury had more than enough to believe that this was a fraudulent half-truth. They stopped paying on July 9th? I don't think I can land it on July 9th, Your Honor. I think it was they only made two of the payments and they stopped in July. All right. Let me address McDonnell briefly because I don't think McDonnell helps Mr. Ferriero at all. Well, what McDonnell did, he and his wife did, was a lot more severe, wasn't it, in terms of $175,000, if I recall, in that case. Your Honor, I heard you put that question to Mr. Goldberger, and I don't know that I can agree that it was more severe. If you're just going to measure the amount of money that ended up in the defendant's hands, by that measure perhaps you are right. But here we have the essence of bribery as New Jersey. New Jersey defines it. And the difference between where we are in McDonnell and where Mr. Ferriero was in McDonnell is we don't believe that this is in use of federal law and involves any use of principles of federalism at all. This is a straightforward application, sure, by the federal prosecution under the Travel Act, of a New Jersey statute. So McDonnell is not relevant at all? I believe it's not relevant at all, except for the extent that It's factually similar because you've got the appearance of public officials or at least people in McDonnell as the governor. It's different than the Bergen County Democratic Organization, but you've got public officials enriching themselves. So I agree that it's not relevant for the most part, but I do want to point out to the Court what the Supreme Court said at 136 Supreme Court, page 273. It says that in contrast to what was going on in McDonnell where the term official act, a federal concept, was being used as the basis for the prosecution, where a state defines its bribery statute in the way that it wants to, that ought to be respected. So here there's no official act in the statute? On the contrary, there is what the model penal code refers to as a ministerial act. In the annotations to MPC section 240.1, it emphasizes that the model penal code focuses even on the little acts, ministerial acts, and they are still within the scope of the model penal code's concept of bribery. That's what we have going on here because the evidence is rampant that Mr. Ferriero was using his position, his apparent influence or his actual influence, to recommend vendors, and in the case of C-3, he was doing it because he was paid to do it. And that's the essence of bribery. What's your response to Mr. Goldberger's argument that he wasn't acting qua BCDO chairman? He was a lawyer, he had other talents, etc. My response, I think, is summed up in one exhibit. Exhibit 7, Government Exhibit 7, in the appendix, is in fact Mr. Ferriero's own tax return from his county, re-elect Joseph Ferriero as county chair, tax-exempt organization. And in it, he lists as an expense of that effort to re-elect him as party chair, the Bogota event that we've argued so much about. It's right there in black and white. And then at the very last page of that tax return, he says that these events are all part of the accomplishments of this tax-exempt organization because these are the ways I communicated as chairman my party positions. The jury had that in front of them. It is impossible to reconcile that black and white exhibit with the argument that you heard that he's not really acting as party chair. He was always acting as party chair, and people danced to his tune as a result of it. One of my favorite pieces of testimony, and I made a big point of it in the brief, and Judge Salas below pointed it out at the sidebar, was when Mr. Ferriero calls up a mayor on New Year's Day and says, I want this other guy appointed as town attorney. And the mayor couldn't deliver because he didn't have the votes. The next time Mr. Ferriero saw him, he grabs him by the forearm, and he says, I asked you for a favor, and you refused. And the mayor was in trouble, and he knew it, and he spent the next year trying to get back in his good graces. This is a guy who wielded enormous power in Burton County. He wasn't afraid to use it, and the sad thing here is that he used it to line his own pockets in connection with several schemes on which the jury was not unanimous, but C3 in which they were. I can go on about the additional evidence. It's not just Exhibit 7. But it's clear that he was not only using his party position to recommend vendors. We know he did it at the record again. Why don't you take your remaining time, if you would, to talk about the nexus requirement? Because I think we're going to ask Mr. Goldberger about that. So here again, we just disagree. Judge Sirico, we have to talk about insurance brokerage and what footnote 69 really means. We read it to mean that you were underscoring that there needs to be a relatedness, a connection between the racketeering acts and the operation of the enterprise. And in an association, in fact, that's pretty easy because it's association, in fact, to commit the racketeering acts. But when you're involved with a legitimate organization, it cannot be the case that the requisite nexus – and by the way, all we're talking about here is the requisite nexus, the connectivity between the acts and the operation of the enterprise. It cannot mean that in the case of a legitimate enterprise, you have to basically turn it into an illegitimate enterprise. And that is the logical extension of the interpretation that Mr. Goldberger – You're saying it's not an all-or-nothing proposition. It's not an all-or-nothing proposition. Is 1% enough? Illegality to take something that's a legitimate business and render it a RICO enterprise? I don't think that I can offer you a percentage test. I can only point out that in the Cedric Kushner case, the Supreme Court said it absolutely is within the scope of RICO to operate an enterprise and use it as the vehicle or the platform to commit other racketeering acts. I think each case is going to be fact-dependent. What were the acts and how close were they to the operation of, in this case, the BCDL? I tried to – Does that open the door off the line? Again, it's fact-dependent. Let me give you an extreme example that I think illustrates what you were driving at in insurance brokerage. And indeed, this Court has dealt with before because it's not the first time a legitimate enterprise, like the Philadelphia Plumbing Inspection Department or other governmental entities, have, in fact, been the enterprise to which the acts are committed. Let's suppose that the next chairman of the Bergen County Democratic Organization thinks, you know, these corruption schemes, this fraud, this bribery, not enough money, too much work, takes too long. So what he does is he says, instead, I'm going to go out and rob banks. And he robs banks because he takes a gun out of the BCDL safe, and he goes and sticks up a bank, takes the proceeds, and sticks it back in the BCDL safe. That is not operating or managing the enterprise in any significant way. It's a coincidence. It's much closer to what the Supreme Court said is not enough. In Reeves, when it said aiding and abetting is not what this statute is all about, you have to manage or operate. But here, we have Mr. Ferriero, who was the BCDL. It's proven in any number of ways. He ran the BCDL in the office, out of the office, at a diner, at the Borgata, all over the place. It was always a BCDL event, and he used it to commit his acts of bribery. And when he failed to disclose what people wanted to know or, in fact, lied to Mayor McHale, I'm not going to recommend a vendor to you when I'm in charge, I promise you. Those are acts of bribery and fraud that are inextricably linked with his chairmanship. And that's a violation of RICO. Any other questions? Thank you, Mr. Keller. Thank you very much. Mr. Goldberger? Let me take some short and quick things first. The date that Your Honor was looking for on the check, all the checks are listed by date and exhibit number on page 14 of our opening brief. And the last check with money relating back was like part of three weeks after these phone calls. So July 27th of 2008. So the government could not draw the inference that there was a panic reaction, they're on to us, we have to stop making these payments. Mr. Keller says his favorite testimony is that bullying conversation that was testified to, and I'm sure it would have been very powerful had the jury believed it, but this was directly related to a scheme on which the jury returned no convictions. We're all for giving the jury the benefit of the verdict. The effort to persuade does not have to succeed in order for there to be a violation, isn't that correct? That's true. And if the jury had believed that there was an effort to persuade, even if it didn't succeed, they would have convicted on acts of racketeering in which they did not convict, including that one. So the jury did not credit this dramatic testimony that Mr. Keller and the government prosecutors at trial wished they had believed. Can that be part of the context that gives rise to the way we understand the later question? If the jury credited it, but the verdicts don't show that the jury's verdict entitles the government to that inference. I understand your point. Thank you. All the evidence on whether the question was asked in those narrow terms, again, we compile on page 37 of our brief and footnote 21 on that page. It's not just depending on Carino's characterization of the question, but it's also Berardo's version. They line up, and they're all the narrow ownership question. The ministerial acts language from the model penal code, I don't have a problem with that, but it doesn't help the government at all. Ministerial acts are not minor acts. They're not acts removed from the official act or, in this case, the public issue. Ministerial acts are official acts that are obligatory and mechanical and non-discretionary. Those acts are covered, yes, ministerial acts, but remote and casual acts are not covered, either under the New Jersey statute or under the federal construction of bribery where it's otherwise undefined that we learned from McDonald. Now, with respect to nexus, what the government is trying to do is destroy the directional requirement that this court discerned in the insurance brokerage case from its reading of Reeves. And in insurance brokerage, explicitly, the court slowly and carefully pointed out that what RICO requires is that the defendant have conducted the affairs of the enterprise through the pattern of racketeering activity. Now, reflecting, I'm going on too long, but reflecting Your Honor's questions, they're talking about the 1%. We don't claim it has to be the affairs of the enterprise in its entirety. That's the government's bogus murder incorporated line. No, of course it could be the affairs of the enterprise in whole or in part. How big a part? Right. How big a part? Right. You know, there can't be. Is it just a field test? I mean, we can't. I'm not sure anyone could put a percent on it, right? If the jury is properly instructed and the evidence is there, then I would say that's going to wind up being a jury question. But that just restates the question. It's going to be a jury question. What's the proper instruction? Right. Yeah. How is that wrong here? In this case, if the proper instruction was. Right. So why wasn't it a possibility for a jury to so conclude? Supported by another evidence. Right. We're saying the evidence isn't. There is not evidence that it was in any substantial part the affairs of the political party. But isn't that based on a premise? It can't be carried out through the bribery. Isn't that based on your premise, though, that Ferriero was acting qua attorney or qua concerned citizen or? Any qua except BCDO chair. Well, it's not for us to say how he was. It's whether the jury could have concluded. Yeah. Why couldn't the jury have said. Not based on guessing, but based on real evidence from which inferences could be drawn. Right. And that evidence includes a very active political operative. This is not a potted plant. I mean, we've got multiple municipalities. He's an active guy, right? So why can't the jury conclude that that activity was wearing the BCDO chairman hat? Because he's active in several different ways, and the jury can't guess which of the ways it was. There has to be some concrete basis from which the jury could draw the inference before we call it an inference and not a guess. Thank you, Mr. Wilkerson. Thank you very much. All right. Case was very well, very, very well briefed and even better argued. The court will take the matter under advice. The court would like a transcript of oral argument as well. If the parties would talk to the clerk's office about that, we'd appreciate it. Thank you. Thank you.